IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PEAK PIPE AND SUPPLY, LLC, | § § | |
| Plaintiffs, | § § | |
| V. | § § | No. 3:18-cv-410-L |
| UMW OILFIELD (L) INTERNATIONAL LTD | § § § § | |
| Defendants. | § | |

# FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE <u>UNITED STATES MAGISTRATE JUDGE</u>

Defendant UMW Oilfield International (L) Ltd, incorrectly named UMW Oilfield (L) International Ltd, ("UMW"), filed a motion to compel arbitration and stay all proceedings. *See* Dkt. No. 7. UMW seeks to compel Plaintiff Peak Pipe and Supply, LLC ("Peak Pipe") to arbitrate its claims against UMW and to stay this case pending arbitration. Although Peak Pipe was not a signatory to the agreement containing the arbitration clause UMW seeks to enforce, UMW contends that Peak Pipe is required to arbitrate its claims against UMW under the equitable estoppel doctrines of intertwined claims and direct benefits estoppel.

United States District Judge Sam A. Lindsay has referred the motion to the undersigned United States Magistrate Judge for hearing, if necessary, and to submit proposed findings and recommendation. *See* Dkt. No. 9.

Peak Pipe filed a response, *see* Dkt. No. 12, and UMW filed a reply, *see* Dkt. No. 13.

For the reasons explained below, the undersigned magistrate judge issues the following findings of fact, conclusions of law, and recommendation:

## Background

SB International, Inc. ("SBI") is a steel company that manufactures and supplies tubular products and pipe for use in the oil and gas industry. It purchases steel pipe of various sizes—known as Oil Country Tubular Goods ("OCTG")—for resale to distributors and customers who use the pipe primarily as casing and tubing in the drilling and completion of oil and gas wells. *See* Dkt. No. 11 at 17-40. SBI, which is not a party to this lawsuit, and Peak Pipe have the same parent company, SB Trading, Inc. *See* Dkt. No. 12-1 at 4-5.

SBI purchases OCTG through various manufacturers and suppliers, including UMW, and UMW has sold OCTG to SBI since as early as 2010. SBI Trading Company provided a guaranty for SBI's obligations to UMW in September 2012. *See* Dkt. No. 11 at 42-46.

On June 24, 2013, UMW and SBI entered a Supply and Distribution Agreement ("SDA"). *See* Dkt. No. 11 at 17-40; Dkt. No. 12-1 at 5-28. The SDA defines the parties as UMW and SBI. *See* Dkt. No. 11 at 17, 18. The SDA creates an exclusive agreement between UMW and SBI for OCTG sold by UMW in the United States and Canada. *See id.* at 19 (defining "territory" as the United States of America and Canada) and 20 (Section 2.1.2) ("[UMW] here by agrees that it will not (i) market or sell any of the Goods in the Territory to any person or company other than SBI..."). Peak Pipe is not

named in the SDA.

The SDA specifically requires that the distribution process begin with an "Ordering Document," which is defined as "the purchase order, or such other similar documents, in the form and manner acceptable to [UMW] issued by SBI." Dkt. No. 11 at 18, ¶ 1.1; 21, ¶2.3.1. The SDA requires that SBI follow a structured invoicing process, and it requires that UMW deliver the products in accordance with the "applicable Ordering Document or any other process agreed to between the Parties from time to time." *Id.* at 26, ¶ 5.1-5.1.2.

Like SBI, Peak Pipe is a steel company that supplies OCTG to its distributors and other customers. *See* Dkt. No. 1-3 at 9. On August 15, 2014, in an email from Mudit Agarwal, in his role as SBI's COO, SBI directed UMW to deliver pipe and tubing products to Peak Pipe and to accept Peak Pipe's purchase orders. *See* Dkt. No. 11 at 72-73, 77 ("Copy of all the purchase orders attached. I will send you a separate purchase order detail from our company Peak Pipe and Supply, who will be the actual importers of record for these shipments. The Purchase order numbers and PO details will remain the same. Only the name of 'To be invoiced' entity will change."). When UMW responded "we need the copy of Purchase Order from Peak Pipe and Supply in PO format with company details instead of using PO from SBI," *id.* at 76, SBI responded "[u]nfortunately we can't provide the PO as you asked, the attached is the best we can do," *id.* at 75.

Peak Pipe purchased OCTG from UMW under three purchase contracts dated

August 13, 2014, November 20, 2014, and May 27, 2015. *See* Dkt. No. 12-1 at 29-32, 33-36, 37-40. The August 13, 2014 Purchase Contract is substantially identical to the purchase order and spreadsheet detailing the product and price that was attached to the August 15, 2014 email between SBI and UMW. *Compare id.* at 72-73 with Dkt. No. 1-3 at 15-18. It was also signed by Mudit Agarwal on behalf of Peak Pipe. *See id.* at 17. The only parties mentioned in the purchase contracts are Peak Pipe and UMW and none of them mention SBI or reference the SDA. SBI Trading Company provided a guaranty for Peak Pipe's obligations to UMW in September 2014. *See* Dkt. No. 11 at 48-52.

A dispute arose between UMW and Peak Pipe about the quality of the pipe delivered, timing of deliveries, and failure to make payments.

The SDA has an arbitration clause. In the SDA, UMW and SBI agreed "that all disputes or differences whatsoever on any issue of construction or effect, any rights, duties and liabilities of the Parties under this Agreement, or any matter arising out of or in connection with this Agreement, shall be ... referred to and finally resolved by way of arbitration[.]" Dkt. No. 11 at 31, ¶¶ 10.2, 10.2.3. The purchase contracts between UMW and Peak Pipe do not contain arbitration clauses.

Pursuant to the SDA, on November 22, 2017, UMW commenced an arbitration proceeding against not only SBI but also Peak Pipe. *See* Dkt. No. 11 at 7-59. UMW asserted that both SBI and Peak Pipe began to default on payments for deliveries and purchases of pipe and tubing products in December 2014 and that the vast majority of

invoices from December 2014 until September 2016, when UMW ceased the sale of goods to SBI and Peak Pipe, remain unpaid. *See id.* at 10-11.

UMW alleges – and Peak Pipe does not dispute – that SBI and Peak Pipe jointly filed a response to the notice of arbitration on December 6, 2017. SBI answered but Peak Pipe asserted that Singapore International Arbitration Centre ("SAIC"), where the arbitration proceeding was filed as required by the SDA, and any SAIC arbitration panel had no jurisdiction over it because it was not a signatory to the SDA. *See* Dkt. No. 7 at 5.

On December 27, 2017, Peak Pipe sued UMW in this court. It voluntarily dismissed the suit on January 8, 2018. *See Peak Pipe & Supply LLC v. UMW Oilfield (L) International Ltd.,* No. 3:17-cv-3495-D (N.D. Tex. 2017).

On January 8, 2018, Peak Pipe sued UMW in state court for breach of the three purchase contracts, breach of express warranty and breach of implied warranty of merchantability. *See* Dkt. No. 1-3 at 8-27. Peak Pipe alleged that UMW consistently fulfilled orders late and with defective pipe. *See id.* UMW removed the case to federal court on February 16, 2018. *See* Dkt. No. 1.

On February 23, 2018, the SAIC's Committee of the Court of Arbitration – after considering UMW's notice of arbitration, Peak Pipe's response to the notice of arbitration, and both UMW's and Peak Pipe's jurisdictional submissions – ruled that "it is *prima facie* satisfied that the arbitration shall proceed." Dkt. No. 11 at 60-61. It stated that the arbitration will now proceed to the selection of a sole arbiter with Peak

Pipe as a party. *See id.* at 61.

UMW filed its motion to compel arbitration and stay all proceedings in this case on March 9, 2018. *See* Dkt. No. 7. UMW contends that the SDA is a holistic agreement that governs the broad scope of the parties' sales and distribution relationship, including the Peak Pipe purchase contracts. UMW argues that Peak Pipe, a non-signatory to the SDA, is bound by the SDA's arbitration agreement under the equitable estoppel doctrines of intertwined claims and direct benefits estoppel. UMW further argues that scope of the arbitration agreement covers Peak Pipe's claims because those claims are effectively counterclaims to UMW's claims in the arbitration proceeding. And UMW asserts that the SDA involves interstate commerce under the FAA.

UMW asks the Court to compel Peak Pipe to arbitrate its claims against UMW and to stay this litigation pending the arbitration. In the alternative, UMW asks the Court to stay the case pending the arbitration panel's final ruling on Peak Pipe's jurisdictional challenge.

Peak Pipe responds that it should not be compelled to arbitrate because it never agreed to arbitrate and that UMW has not established a basis to compel arbitration through equitable estoppel. According to Peak Pipe, its relationship with UMW is governed solely by the three purchase contracts.

The undersigned concludes that the Court should grant UMW's motion to compel arbitration.

## Legal Standards

The Federal Arbitration Act ("FAA") embodies a national policy favoring

arbitration agreements. *See Municipal Energy Agency of Miss. v. Big Rivers Elec. Corp.*, 804 F.2d 338, 342 (5th Cir. 1986) (citing *Southland Corp. v. Keating*, 465 U.S. 1 (1984)). Section 2 of the FAA provides that

> [a] written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. "The FAA reflects the fundamental principle that arbitration is a matter of contract," *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010), and courts are generally required to enforce arbitration agreements according to their terms, *see id.* at 67.

Under Section 4 of the FAA, "a party 'aggrieved' by the failure of another party 'to arbitrate under a written agreement for arbitration' may petition a federal court 'for an order directing that such arbitration proceed in the manner provided for in such agreement.'" *Id.* (quoting 9 U.S.C. § 4). The court must order arbitration "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4.

Courts in the Fifth Circuit employ a two-step inquiry when deciding a motion to compel arbitration under the FAA. *See Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)). The first step is to determine whether the parties agreed to arbitrate the dispute at issue. *See Webb v. Instacorp., Inc.*, 89 F.3d 252, 258

(5th Cir. 1996) (per curiam). The second step is to determine whether any legal restraints external to the agreement foreclose arbitration of the dispute. *See OPE Int'l LP v. Chet Morrison Contractors, Inc.*, 258 F.3d 443, 445-46 (5th Cir. 2001) (per curiam). Given the federal policy favoring arbitration, the Court's task is narrowly circumscribed. *See Singh v. Choice Hotels Int'l, Inc.*, No. 3:07-cv-0378-D, 2007 WL 2012432, at *2 (N.D. Tex. July 11, 2007). Upon a finding that these two steps are satisfied, the Court must stay proceedings to allow for arbitration "in accordance with the terms of the agreement." 9 U.S.C. § 3.

## Analysis

I. <u>There is no agreement to arbitrate between UMW and Peak Pipe.</u>

The Court's determination of whether the parties agreed to arbitrate the dispute at issue requires consideration of whether a valid agreement to arbitrate exists among the parties and, if so, whether the dispute is within the scope of the arbitration agreement. *See Webb*, 89 F.3d at 258. The "federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Fleetwood*, 280 F.3d at 1973. Generally, a party cannot be required to arbitrate absent an agreement to do so. *See Nat'l Oilwell Varco, L.P. v. Sadagopan*, No. H-16-2261, 2018 WL 276364, at * (S.D. Tex. Jan. 3, 2018) (citing *First Options of Chi. v. Kaplan*, 514 U.S. 938, 943 (1995).

Here, it is undisputed that Peak Pipe was not a signatory to the SDA, which contains the arbitration agreement. And UMW does not dispute Peak Pipe's claim that

there was no agreement to arbitrate between UMW and Peak Pipe or seek to compel arbitration on that basis.

II.     Peak Pipe is equitably required to arbitrate its claims against UMW.

Arbitration agreements apply to non-signatories only in rare circumstances. *See Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003). "Federal courts have recognized six theories, arising out of common principals of contract and agency law, that may bind non-signatories to arbitration agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel; and (6) third-party beneficiary." *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005); *see also Bridas*, 345 F.3d at 356 (same). UMW contends that Peak Pipe, a non-signatory, is bound to arbitrate under the SDA by the equitable estoppel doctrines of intertwined claims and direct benefits estoppel. *See Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 609-610 (5th Cir. 2016).

A.      Peak Pipe derived direct benefits under the SDA.

Direct benefits estoppel applies to parties who seek "to derive a direct benefit" from a contract with an arbitration agreement. *Jody James Farms, JV v. Altman Group, Inc.*, ___ S.W.3d ___, No. 17-0062, 2018 WL 2168306, at *7 (Tex. Mar. 20, 2018) (not yet released for publication) (citing *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 527 (Tex. 2015)). When a claim depends on the contract's existence and cannot stand independently – that is, the alleged liability "arises solely from the contract or must be determined by reference to it" – equity prevents a person from

avoiding the arbitration clause that was part of that agreement. *See id.*; *see also Hays*, 838 F.3d at 609 ("Direct benefits estoppel applies when the claim depends on the contract's existence and would be unable to stand independently without the contract.") (citations and quotations omitted). But "[w]hen the substance of the claim arises from general obligations imposed by state law, including statues, torts and other common law duties, or federal law," direct-benefits estoppel is not implicated even if the claim refers to or relates to the contract or would not have arisen "but for" the contract's existence. *Jody James*, 2018 WL 2168306, at *7.

Direct benefits estoppel applies to "non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract." *Petrobas America, Inc. v. Vicinay Cadenas,* S.A., 276 F. Supp. 3d 691, 694 (S.D. Tex. 2017) (quoting *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517 (5th Cir. 2006). "A non-signatory can 'embrace' a contract containing an arbitration clause in two ways: (1) by knowingly seeking and obtaining 'direct benefits' from that contract; or (2) by seeking to enforce the terms of that contract or asserting claims that must be determined by reference to that contract." *Id.* (quoting *Noble Drilling Servs., Inc. v. Certex USA, Inc.* 620 F.3d 469, 473 (5th Cir. 2010).

UMW argues Peak Pipe knowingly obtained direct benefits from the SDA. According to UMW, without the SDA and instructions from SBI – specifically, Mudit Agarwal who is an executive of both SBI and Peak Pipe – Peak Pipe could never have

received products from UMW because the SDA established an exclusive distribution agreement between UMW and SBI. *See* Dkt. No. 11 at 20, ¶¶ 2.12-2.14. With the exclusive distribution agreement in place, SBI not only allowed but also directed UMW to invoice and distribute OCTG to Peak Pipe, *see id.* at 66-73, and the Peak Pipe purchase contracts are simply substitute purchase orders under the SDA for the orders SBI directed UMW to make to Peak Pipe. Accordingly, UMW asserts that Peak Pipe's claims arise under the SDA and that Peak Pipe derived direct benefits from the SDA.

Conversely, Peak Pipe argues that its claims are based solely on the three purchase contracts. Peak Pipe points out that its complaint does not mention the SDA, and Peak Pipe asserts that its dispute with UMW arose from UMW's failure to perform as required by the three separate purchase contracts.

But "[w]hether a claim seeks a direct benefit from a contract containing an arbitration clause turns on the substance of the claim, not artful pleading." *Hays*, 838 F.3d at 609.

Peak Pipe also argues that the purchase contracts are standalone agreements under the Uniform Commercial Code. *See* TEX. BUS. & COM. CODE § 2.204(a) ("[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract"). Peak Pipe asserts that each purchase contract includes its desired price, quantity, payment terms, quality specifications, and shipping instructions and the purchase contracts – far more than simply shipping details and arrangements – and UMW

attempted to fulfill them.

According to Peak Pipe, the terms of the purchase contracts and SDA are materially different. For example, the SDA provides that if UMW

> complies with (i) all requirements in each Order (including the Requirements and delivery date) and (ii) all other requirements of [UMW] set forth in this Agreement, then all Orders which have been accepted by [UMW] shall be binding on SBI and may not be altered, cancelled, or withdrawn,

Dkt. No. 11 at 21(Section 2.3.4), but the purchase contracts provide that

> Peak Pipe and Supply, LLC holds the right to cancel or extend these orders if any of the purchase contract or purchase order terms are not met,

Dkt. No. 12-1 at 30, 34, 38. The SDA requires payment within 75 days of acceptance, *see* Dkt. No. 11 at 26 (Section 4.3.1(b)), but the purchase contracts require payment within 90 days, *see* Dkt. No. 12-1 at 30, 34, 38. And English law governs the SDA, *see* Dkt. No. 11 at 31 (Section 10.1), but United States law governs the purchase contracts, *see* Dkt. No. 12-1 at 30, 34, 38.

Although Peak Pipe points out these differences between the SDA and purchase contracts and argues that the purchase contracts are stand-alone agreements, it makes no mention of how it was able to purchase OCTG from UMW when UMW had an exclusive supply and distribution agreement with SBI – namely, SBI's instructions to UMW to sell to Peak Pipe. And that silence is deafening in this context.

Peak Pipe derived direct benefits under the SDA because it was able to purchase OCTG from UMW that it would have been otherwise unable to purchase due to the exclusive supply and distribution agreement between UMW and SBI. Accordingly,

-12-

Peak Pipe is estopped to avoid the arbitration clause in the SDA and should be compelled to arbitrate.

        B.      <u>Intertwined claims estoppel does not apply against Peak Pipe.</u>

"Intertwined claims estoppel involves 'compel[ling] arbitration when a non-signatory defendant has a 'close relationship' with one of the signatories and the claims are 'intimately founded in and intertwined with the underlying contract obligations.'" *Hays*, 838 F.3d at 610 (quoting *In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 193-94 (Tex. 2007) (quoting *Thompson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995))). Courts have employed this exception to dismiss "strategic pleading" that seeks to avoid arbitration. *See Hays*, 838 F.3d at 610.

UMW contends that Peak Pipe's claims are "hopelessly" intertwined with the SDA and those claims under the SDA pending in the arbitration.

Peak Pipe argues that it is unclear whether Texas law recognizes the equitable estoppel doctrine of intertwined claims but that, if it does, the doctrine does not apply for two reasons: it applies only against signatories, not non-signatories, and Peak Pipe's claims are not founded in or intertwined with the SDA.

Although the Texas Supreme Court has not expressly adopted intertwined claims as a valid theory of estoppel, *see In re Merrill Lynch*, 235 S.W.3d at 193, the Fifth Circuit made an "*Erie* guess" and concluded that the Texas Supreme Court would apply the doctrine in appropriate circumstances, *see Hays*, 838 F.3d at 610-11.

In *Merrill Lynch*, the Texas Supreme Court was required to decide whether arbitration could be compelled based solely on the equitable estoppel theory of

-13-

concerted misconduct. *See* 235 S.W.3d at 191-95. The Texas Supreme Court referenced intertwined claims estoppel for the purpose of comparing it with concerted misconduct estoppel and acknowledged that "other federal circuits have estopped signatory plaintiffs from avoiding arbitration with nonsignatories using an 'intertwined-claims' test." 235 S.W.3d at 193. *See id.* at 193-95. "Distinguishing the two theories, the Texas Supreme Court explained that concerted misconduct estoppel lacks the limiting 'close relationship' component of intertwined claims estoppel." *Hays*, 383 F.3d at 610; *see In re Merrill Lynch*, 235 S.W.3d at 194.

In *Hayes*, the Fifth Circuit determined that the Texas Supreme Court "intimated at the validity of intertwined claims estoppel" in *Merrill Lynch*. 838 F.3d at 612. Based on that determination, in addition to application of intertwined estoppel by Texas lower courts and the strong federal and Texas state policy favoring arbitration, the Fifth Circuit determined that "the Texas Supreme Court, if faced with the question, would adopt intertwined claims estoppel." *Id.*

In *Hays*, the Fifth Circuit also noted "[s]ome imprecision exists when distinguishing between intertwined claims and concerted misconduct estoppel." *Hays*, 383 F.3d at 610 n.4. For example, it observed that it used the phrase "intertwined claims" in *Grigson v. Creative Artists Agency LLC*, 210 F.3d 524, 527-28 (5th Cir. 2000), but did so in reference to concerted misconduct estoppel, *see id.* Conversely, the Court of Appeals observed that the Texas Supreme Court, in *Merrill Lynch*, differentiated between *Grigson's* concerted misconduct test, which it ultimately rejected, and the

theory of intertwined claims estoppel. *See Hays*, 838 F.3d at 610 n.4; *In re Merrill Lynch*, 235 S.W.3d at 192-93.

Subsequently, in *Jody James*, the Texas Supreme Court faced the issue of whether arbitration could be compelled under the intertwined claims theory of equitable estoppel. *See* 2018 WL 2168306, at * 9. The Texas Supreme Court discussed the intertwined claims theory of equitable estoppel and acknowledged the Fifth Circuit's "*Erie* guess" but decided that it "need not consider the viability" of the intertwined claims doctrine in the case before it because "even if we were to embrace it," the respondent had not shown its applicability. *See Jody James*, 2018 WL 2168306, at * 9.

In *Jody James*, the Texas Supreme Court explained that, under the intertwined claims estoppel theory, "non-signatories can successfully compel arbitration when (1) they have a close relationship with a signatory to a contract with an arbitration agreement and (2) the claims are "intimately founded in and intertwined with the underlying contract obligations." *Id.* (quoting *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995)). Intertwined claims estoppel applies when there is a "tight relatedness of the parties, contracts, and controversies." *Id.* (quoting *JLM Indus., Inc. v. Stolt-Nielsen, SA*, 387 F.3d 163, 177 (2d Cir. 2004)). But that "does not 'mean that whenever a relationship of any kind may be found among the parties to a dispute and their dispute deals with the subject matter of an arbitration contract made by one of them, that party will be estopped from refusing to arbitrate." *Id.* (quoting

*Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 359 (2d Cir. 2008)). "Rather, 'the obligation to arbitrate depends on consent'"; intertwined claims estoppel "requires not only a dispute intertwined with the contract but also a relationship between the parties that developed in a manner that makes it 'unfair' *not* to compel arbitration." *Id.* (emphasis in original) (quoting *Sokol*, 542 F.3d at 358, 361).

The Fifth Circuit's "interpretation of Texas law is binding on the district court, unless a subsequent state court decision or statutory amendment renders [the Fifth Circuit's] prior decision clearly wrong." *Hughes v. Tobacco Institute, Inc.*, 278 F.3d 417, 421 (5th Cir. 2001). Because the Texas Supreme Court continues to imply the validity of intertwined claims estoppel, the Court should continue to follow *Hays* and assume that the Texas Supreme Court would apply the intertwined claims doctrine of equitable estoppel in appropriate circumstances.

Next, Peak Pipe argues that, if the intertwined claims theory of equitable estoppel is valid in Texas, it does not apply in this case because it applies only against signatories to an arbitration agreement, not non-signatories like Peak Pipe. For support, Peak Pipe cites *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, which makes a distinction between compelling arbitration against a signatory versus a non-signatory to an arbitration agreement under concerted misconduct estoppel. *See* 345 F.3d at 361. In *Bridas*, the Fifth Circuit relied on its opinion in *Grigson v. Creative Artists Agency LLC*, 210 F.3d 524, 527-28 (5th Cir. 2000), which also addressed concerted misconduct estoppel, to hold that an arbitration agreement could be construed against a signatory but not against a non-signatory. *See id.* at 360-61. According to the Fifth Circuit in

*Bridas*, a signatory cannot pursue the benefits of a contract against a non-signatory and avoid the burdens of the contract's arbitration requirement, but "the reverse is not also true: a signatory may not estop a nonsignatory from avoiding arbitration regardless of how closely affiliated that nonsignatory is with another signing party." 345 F.3d at 361; *see also USHealth Group, Inc. v. South*, 636 F. App'x 194, 199 (5th Cir. 2016) (following *Grigson* and holding that, under the concerted misconduct estoppel, a signatory cannot estop a non-signatory from avoiding arbitration).

UMW asserts that Peak Pipe conflates the intertwined claims and concerted misconduct theories of equitable estoppel, as the Fifth Circuit warned against in *Hays,* because authorities cited by Peak Pipe – *Bridas* and *South* – follow *Grigson* and address concerted misconduct, not intertwined claims, estoppel.

Nevertheless, the purpose of the intertwined claims theory of equitable estoppel is to "prevent signatories to an arbitration agreement from avoiding arbitration simply by suing nonsignatory parties." *Hays*, 838 F.3d at 610 (citing *Merrill Lynch*, 235 S.W.3d at 193-94). Thus, even if this case were filed in a strategic attempt to avoid arbitration, as UMW contends, Peak Pipe, as a nonsignatory plaintiff, cannot be compelled to arbitrate its claims against UMW under the intertwined claims theory, no matter how close the relationship between Peak Pipe and SBI may be or whether Peak Pipe's claims in this lawsuit and UMW's claims in the pending arbitration are intertwined.

III.    <u>The scope of the Arbitration Agreement in the SDA covers Peak Pipe's claims.</u>

According to UMW, Peak Pipe's claims involving the quality and timeliness of

deliveries of the pipe and tubing purchased from UMW are effectively counterclaims to UMW's claims for failure to pay in the arbitration. The SDA requires arbitration in the event of "all disputes of differences whatsoever ... or any matter arising out of or in connection with this Agreement." Dkt. No. 11 at 31, ¶¶ 10.2, 10.2.3. Peak Pipe's claims fall within the scope of the arbitration agreement.

IV.   The SDA involves commerce under the FAA.

The transactions at issue involve the international sale of pipe and tubing products from a Malaysian company to a Texas LLC and a Texas company. This is sufficient to satisfy the FAA's "commerce" requirement. *See* 9 U.S.C. § 2; *Sparks v. Stone St. Capital*, 2002 WL 1575404, at *6 (N.D. Tex. July 15, 2002).

V.   Peak Pipe is deemed to consent to UMW's requested alternative relief.

UMW seeks, as alternative relief, a stay of the case pending the final ruling by the SIAC tribunal on Peak Pipe's jurisdictional challenge in the arbitration. *See* Dkt. No. 7 at 9; *see also Hill v. G.E. Power Sys., Inc.*, 282 F.3d 343, 348-49 (5th Cir. 2002) (holding that 9 U.S.C. §3 requires a staty of proceedings when claims to be arbitrated are "inseparable in any practical way" from those to be resolved in litigation).

Peak Pipe does not address UMW's request for alternative relief and, as a result, is deemed to consent. *See* FED. R. CIV. P. 8 ("An allegation ... is admitted if a responsive pleading is required and the allegation is not denied."); N.D. TEX. L. CIV. R. 7.1(d), (h) (requiring a response to an opposed motion).

**Recommendation**

The Court should grant Defendant's Motion to Compel Arbitration and Stay All

Proceedings [Dkt. No. 7].

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: June 18, 2018

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE